IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Tarek El Hadidi, | ) | Civil Action No.: 4:12-cv-535-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Intracoastal Land Sales, Inc.; ABC– | ) | |
| XYZ (a series of fictitious | ) | |
| corporations); and John Does 1–10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Tarek El Hadidi ("Hadidi" or "Plaintiff") filed this action in the Superior Court of New Jersey against the above captioned Defendants on February 4, 2011.  *See* Compl., ECF No. 1-2. Defendant Intracoastal Land Sales, Inc. ("Defendant" or "Intracoastal") removed the action to the United States District Court for the District of New Jersey on June 24, 2011.  *See* Notice of Removal, ECF No. 1.  Defendant moved to dismiss or transfer the action, *see* Mot. to Dismiss, ECF No. 7, and on February 24, 2012, the District of New Jersey issued an Order transferring the matter to this Court, *see* Order, ECF No. 18.[1]  Defendant again moved to dismiss the action on March 9, 2012.  *See* Mot., ECF No. 21.  The undersigned granted that motion in part and denied it in part on February 20, 2013. *See* Order, ECF No. 30.  The Court granted the motion with respect to Plaintiff's claims for outrage and negligent infliction of emotional distress.  *See id.* at 7.  The Court denied the motion as to Plaintiff's remaining claims, determining that Plaintiff's statute of limitations arguments were premature at the motion to dismiss stage.  *See id.* at 5.

---

[1] This Order also dismissed Plaintiff's cause of action for violation of the New Jersey Deceptive Business Practices Act.  *See* ECF No. 18.

On February 4, 2014, Defendant filed the motion for summary judgment that is presently before the Court, arguing that Plaintiff's remaining claims are barred by the applicable statute of limitations.  *See* Mot., ECF No. 57.  Plaintiff responded on March 10, 2014, *see* Pl.'s Response, ECF No. 62, and Defendant replied to the response on March 20, 2014, *see* Reply, ECF No. 63.   The undersigned held a hearing on May 28, 2014, with attorney Walker H. Willcox appearing on behalf of Plaintiff and attorneys Jeffrey S. Tibbals and W. Chase McNair appearing on behalf of Defendant.

Having considered the filings of the parties and the arguments of counsel, the Court finds that, applying New Jersey's conflict of laws rules, South Carolina law should apply to this action. Therefore, South Carolina's statute of limitations will apply to Plaintiff's claims.   The Court, however, finds that there is a genuine issue of material fact regarding whether Plaintiff's claims are timely.   Accordingly, Defendant's motion for summary judgment is denied.

## FACTUAL BACKGROUND

This dispute centers around two undeveloped lots in the Waterway Palms Plantation ("the development") in Myrtle Beach, South Carolina, which Plaintiff purchased from Defendant. Plaintiff alleges a series of misrepresentations, primarily concerning a "second property report" (discussed in more detail below), which asserted that the water and sewer infrastructure at the development would be completed in April 2005.    Plaintiff asserts that Defendant's misrepresentations led him to purchase the property in April 2005, and that further misrepresentations regarding completion of the infrastructure continued even after the closing, and that he relied on all of this to his detriment.[2]

---

[2] Plaintiff's affidavit sets forth the gravamen of his claims in greater detail.   The relevant portion reads as follows:

2

In February of 2005, Plaintiff, a New Jersey citizen and resident, received a solicitation in New Jersey from Defendant inviting him to a dinner and sales presentation.   *See* Aff. of Tarek El Hadidi, ECF No. 62-8 at ¶ 2.   In the middle of February 2005, Plaintiff went to a sales presentation conducted by representatives of Defendant at the Bridgewater Marriot Hotel in Bridgewater, New Jersey regarding the development.   *See* Hadidi Dep., ECF No. 62-2 at 32:1–8.   At the sales pitch, he received the first of two federal property reports.   *See* ECF No. 62-8 at ¶ 16.   This report estimated

---

21. At the time of the presentation, the sales team emphatically stressed that the project was ahead of schedule and due for completion by April 2005.   Thus, their message was that completion would occur at approximately the same time as when I needed to close to qualify for the special early closing incentives.

22. In addition to being late with the completion of the sewer, Intracoastal was also substantially behind schedule on the "community improvements, and amenities."   Despite, the fact that I could not use or enjoy the amenities, I had to pay for the amenities.

23. As a result, I had raw unusable property that could not be put to meaningful use.

24. After extended delays, lot owners were unable to build for immediate occupancy.   Yet people were still burdened with making payments on their lots.   Many lot owners began selling their lots.   As more people began to sell their lots, a rapid downward spiral occurred. As property values diminished it became more and more difficult to obtain a construction loan because lot values fell beneath loan requirements.   It is my belief that this downward spiral was caused largely as a result of the delay and the material misrepresentations that were made by Intracoastal.   The seller deceptively misrepresented the maturity level of the land so as to make it more appealing and enhance the value of the land.

25. I was never able to enjoy the use of the property or realize the value of my investment.

Aff. of Tarek El Hadidi, ECF No. 62-8 at ¶¶ 21–25.

3

that the development's sewer infrastructure would be completed in October 2004.  *Id.*  Moreover, this report indicated that the water lines in Phase 1 of the development would be completed by April 2005.  *See* ECF No. 64-4 at 2.  At the sales pitch, Plaintiff paid a refundable deposit and signed a document "securing his interest" in visiting and purchasing property in the development.  *See* ECF No. 62-8 at ¶ 11.

In March of 2005, Plaintiff flew down to Myrtle Beach to view the property and meet with Defendant's representatives.  *See* ECF No. 62-8 at ¶ 11.  At the first presentation by Defendant in Myrtle Beach, Plaintiff received a second property report which explained that the sewer and water infrastructure now both had a revised completion date of April 2005.  *See* ECF No. 62-2 at 46:19–47:3.  Plaintiff testified in his deposition that a representative of Defendant specifically pointed out that the sewer infrastructure date had been moved back from the first report.  *Id.*  Plaintiff, however, stated that Defendant's representatives indicated they were making progress and were ahead of the new schedule.  *Id.* at 47:4–15.  Plaintiff signed documents acknowledging receipt of both federal property reports while in Myrtle Beach.  *See* Acknowledgments, ECF No. 57-6.

Plaintiff was offered special incentives by Defendant, but only if closing occurred by April 2005.  ECF No. 62-8 at ¶ 17.  Accordingly, while in Myrtle Beach, Plaintiff executed an "Offer to Purchase and Contract" on Lot 282 of the development on March 11, 2005, and paid the earnest money.  *See* Cotner Aff., ECF No. 57-2 at ¶¶ 12–13; Contract, ECF No. 57-7 at 4–5.  While still in Myrtle Beach, Plaintiff also executed an Offer to Purchase and Contract on Lot 89 of the development on March 12, 2005, and paid the earnest money.  *See* ECF No. 57-2 at ¶¶ 12–13; Contract, ECF No. 57-7 at 2–3.  Both of these lots were in Phase I of the development.  The transactions both closed at the Stanley Law Firm in Myrtle Beach, South Carolina on April 20, 2005.  *See* ECF No. 57-2 at ¶¶

4

14; HUD Settlement Statements, ECF No. 57-8.   The closing attorney, however, did a "closing by mail," sending various documents to Plaintiff for execution in New Jersey.   *See* ECF No. 10-9 at 85–86.

Plaintiff testified that he relied on the representations made in the Federal Property Reports and from Intracoastal that the infrastructure would be ready for construction in April 2005, and that it was important to him that he be able to immediately build upon the properties after closing.   *See* Hadidi Dep., ECF No. 57-3 at 50:1–9; ECF No. 62-2 at 87:12–88:8.   He noted that, prior to purchasing the lots, Defendant represented that construction on the water and sewer lines began in 2004, and that as of March 2005 the sewer lines were 70% complete.   *See* ECF No. 68-8 at ¶ 39. Subsequently, Plaintiff received a letter, dated May 31, 2005, which indicated that the sewer construction was 90% complete and the water construction was 60% complete.   *See* Letter, ECF No. 57-9.

Plaintiff asserts that when he visited the development again in September 2005, he observed that it "was not being developed in a manner consistent with what the developer had represented to him."   *See* ECF No. 1-2 at ¶ 20.   Plaintiff stated in his deposition, however, that he had no reason to believe that there would be any issues with the lots being ready for construction, as he "had gotten communications from Intracoastal saying that everything was on schedule, fine, great, perfect, on time, ahead of time, beautiful."   ECF No. 57-3 at 75:1–22.   Therefore, in November of 2005, Plaintiff retained a builder.   *See* ECF No. 63-1 at 73:3–15.   Plaintiff testified that he was aware he could not move in without a certificate of occupancy, and thus would not want to build without knowing he could obtain one.   *See* ECF No. 62-2 at 88:9–17.   However, he indicated that he was not

aware at that juncture whether he had to wait until the water and sewer infrastructure was completely finished to begin building.  *See id.*

Subsequent to retaining the builder, Plaintiff continued to inquire as to the status of the infrastructure development.   Plaintiff asserts he was told that Defendant was doing everything it was supposed to do and that everything was fine on its end.   *See* ECF No. 62-2 at 89:17–25.   He testified in his deposition that he continued to receive communications between April 2005 and October 2008 from Intracoastal indicating that "they were very pleased with the progress" and "everything was ahead of schedule."   *Id.* at 72:10–22.   Plaintiff submitted several newsletters which Defendant sent to the lot owners in the development, including Plaintiff, which represented that the water and sewer infrastructure were near completion.   *See* Newsletters, ECF No. 62-6 at 8–9.   These Community Newsletters, dated November of 2006[3] and August of 2007,[4] indicated that the reason for the delay was that the developer had not secured final regulatory approval for the water and sewer infrastructure.   *See id.*   The water and sewer infrastructure was completed, approved by South Carolina Department of Health and Environmental Control, and placed into operation on November 29, 2007.   *See* DHEC Approval, ECF No. 57-10.

Plaintiff states that he first began having doubts about the truthfulness of Defendant's representations in late 2008.   *See* ECF No. 68-8 at ¶ 40.   He testified that he heard rumors about another one of Defendant's developments having issues, which spurred him to make an inquiry to the

---

[3] This newsletter stated that "[t]he final water & sewer (as-builts) testing and inspections are currently underway on all three Phases.   The Developer anticipates securing the final approvals within the next 30 days."   Nov. 2006 Newsletter, ECF No. 62-2 at 8.
[4] This newsletter stated that "[a]ll infrastructure . . . work in these three sections has been installed. The General Contractor continues to address punch list items on the Water & Sewer systems as identified by Grand Strand Water and Sewer Authority and DHEC."   Aug. 2007 Newsletter, ECF No. 62-2 at 9.

Grand Strand Water and Sewer Authority.  *See* ECF No. 57-3 at 86:15–25.  On May 6, 2009, Plaintiff received email correspondence and attachments from an employee with the Grand Strand Water and Sewer Authority which contained various documents related to the water and sewer infrastructure at the development.  *See* Email and Attachements, ECF No. 7.  Plaintiff argues that these documents first informed him that, despite Defendant's representations and assertions to the contrary, Defendant had not received regulatory approval to install the sewers at the time he purchased the lots.  *See* ECF No. 68-8 at ¶ 20.  Plaintiff also asserts that these documents informed him for the first time that Defendant was seeking approval to begin construction more than a year after it should have been 70% complete per Defendant's assertions.  *See id.* at ¶ 34.  He claims that "[o]nly upon receipt of the email . . . did I know that Defendants knowingly misrepresented the development construction deadlines."  *See id.* at ¶ 40.  Finally, Plaintiff argues that this documentation informed him that Defendant was aware of significant problems with the sewer system in December 2006, which Defendant never disclosed to him despite his inquiries.  *See* ECF No. 62-8 at ¶ 40.

Plaintiff filed this suit on February 24, 2011 in the Superior Court of New Jersey asserting that Defendant misrepresented various facts in connection with the purchase of these lots, and continued to misrepresent the status of the infrastructure development and the reasons behind the delay.  As a result of these alleged misrepresentations, Plaintiff claims that his property values decreased and that he could not realize the benefits of his investments.  In particular, the following claims are still

pending: New Jersey Consumer Fraud Act (Count I);[5] Negligent Misrepresentation (Count II); Fraud and Intentional Misrepresentation (Count III); Unjust Enrichment (Count IV). Defendant's motion for summary judgment solely challenges whether these claims are timely. The parties first dispute which state's law should apply—New Jersey or South Carolina—under the applicable choice of law rules. The parties then dispute whether the claims are timely under the appropriate statutes.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes the showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

When no genuine issue of any material fact exists, summary judgment is appropriate. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id.* However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In this case, the moving party "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick Cnty. Comm'rs*, 845 F.2d 716, 718 (4th Cir. 1991)

---

[5] Defendant conceded at the hearing that Plaintiff need not amend the complaint to convert this claim under the New Jersey Consumer Fraud Act to a claim under the South Carolina Unfair Trade Practices Act ("SCUTPA") should the Court determine that South Carolina law applies.

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).   If the moving party carries this burden, "the burden then shifts to the non-moving party to come forward with fact sufficient to create a triable issue of fact."   *Id.* at 718–19 (citing *Anderson*, 477 U.S. at 247–48).

Moreover, "once the moving party has met its burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial."   *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992).   The nonmoving party may not rely on beliefs, conjecture, speculation, of conclusory allegations to defeat a motion for summary judgment.   *See id.*; *Doyle v. Sentry, Inc.*, 877 F. Supp. 1002, 1005 (E.D. Va. 1995).   Rather, the nonmoving party is required to submit evidence of specific facts by way of affidavits, depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial.   *See* Fed. R. Civ. P. 56(c), (e); *Baber*, 977 F.2d at 875 (citing *Celotex*, 477 U.S. at 324)).   Moreover, the nonmovant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."   *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993); *DeLeon v. St. Joseph Hosp., Inc.*, 871 F.2d 1229, 1223 n.7 (4th Cir. 1989).

### DISCUSSION

## I.     New Jersey Choice of Law Rules Require the Application of the South Carolina Law.

Following a transfer under 28 U.S.C. § 1404(a) initiated by a defendant, the transferee court must follow the choice-of-law rules that prevailed in the transferor court.   *Van Dusen v. Barrack*, 376 U.S. 612 (1964).   New Jersey has adopted the two-pronged "most significant relationship test" set forth in the Restatement (Second) Conflict of Laws (the "Restatement").   *P.V. v. Camp Jaycee*, 962 A.2d 453, 455 (N.J. 2008).   "The first prong of the analysis requires a court to examine the substance of the potentially applicable laws in order to determine if an actual conflict exists. . . . The second

prong of the most significant relationship test requires the Court to weigh the factors enumerated in the Restatement section corresponding to plaintiffs' cause of action." *Ghaffari v. Hern*, No. 06-931, 2009 WL 2147092, at *5 (D.N.J. July 15, 2009) (citations omitted).

Under the first prong, a conflict arises when potentially applicable laws differ in substance. *Camp Jaycee*, 962 A.2d at 460. Here, the two jurisdictions whose laws might apply are South Carolina and New Jersey. South Carolina has a three-year statute of limitations for private actions under SCUTPA, as well as for claims of negligent misrepresentation, fraud, and unjust enrichment. *See Brooks v. GAF Materials Corp.*, 284 F.R.D. 352 (D.S.C. 2012) ("South Carolina law provides for a three-year statute of limitations on actions for negligence, negligent misrepresentation, fraud, and unfair trade practices."); S.C. Code Ann. § 15-3-530(1) (2010) (three year statute of limitations for "an action upon a contract, obligation, or liability, express or implied"). New Jersey has a six-year statute of limitations for claims under the New Jersey Consumer Fraud Act ("NJCFA"), negligent misrepresentation, fraud, and unjust enrichment. *See Tammera v. Grossman*, No. 10-569, 2010 WL 1372406, at *5 (D.N.J. Mar. 29, 2010) (six year statute of limitations for common law fraud); *R.C. Beeson, Inc. v. Coca Cola Co.*, 337 Fed. App'x 241, 242 (3d Cir. 2009) (six year statute of limitations for unjust enrichment claims); *Intarome Fragrance & Flavor Corp. v. Zarkades*, No. 07-873 (DRD), 2009 WL 931036, at *6 (D.N.J. Mar. 30, 2009) (six year statute of limitations for negligent misrepresentation claims).

New Jersey courts have recognized that where the time limits in the statutes of limitation of two states differ, it creates a true conflict which prompts analysis under the second prong of the "most significant relationship" test. *See e.g.*, *Paul v. Prudential Ins. Co. of Am.*, No. 08-6197, 2009 WL 2959801, at *6 (D.N.J. Sept. 15, 2009) (finding conflict existed when "three states apply different

10

statutes of limitations to their consumer fraud statutes"); *Intarome Fragrance*, 2009 WL 931036, at *6–7 (finding an actual conflict between Delaware and California's three year statutes of limitations and New Jersey's six year); *Smith v. Alza Corp.*, 948 A.2d 686, 694 (N.J. Sup. Ct. App. Div. 2008) ("Unquestionably, there is an actual conflict between New Jersey's and Alabama's statute of limitations.").   As Plaintiff correctly notes, where the application of either statute of limitations would "yield the same result, no conflict exists."   *See Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 304 (D.N.J. 2009).   Here there is no genuine issue of material fact as to whether the action was timely under New Jersey law: the lots were purchased in March of 2005 and the action was filed less than six years later in February of 2011.   As more fully discussed below, however, under South Carolina law there is a genuine issue of fact as to whether this action was brought within the three year statute of limitations.   Accordingly, there is an actual conflict in this case because the court cannot say that application of either statute would necessarily yield the same result.

Therefore, the Court must move to the second prong, which requires balancing the factors from the appropriate sections of the Restatement.   New Jersey courts apply "the conflict of laws analysis of Section 148 for claims sounding in fraud or misrepresentation."   *See Maniscalco v. Brother Int'l Corp.*, 793 F. Supp. 2d 696, 705 (D.N.J. 2011) (this case also applied Section 148 to a consumer fraud claim).   New Jersey courts apply Section 221 of the Restatement to unjust enrichment claims.   *See In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 60 (D.N.J. 2009).

**A. Consumer Fraud, Negligent Misrepresentation, and Fraud Causes of Action —
Section 148 of the Restatement Mandates Applying South Carolina Law**

When the misrepresentations/fraud and Plaintiff's reliance occur in the same state, Section

148(1) of the Restatement applies.   This provision explains that:

> When the plaintiff has suffered pecuniary harm on account of his
> reliance on the defendant's false representations and when the
> plaintiff's action in reliance took place in the state where the false
> representations were made and received, the local law of this state
> determines the rights and liabilities of the parties unless, with respect to
> the particular issue, some other state has a more significant relationship
> under the principles stated in § 6 to the occurrence and the parties, in
> which event the local law of the other state will be applied.

*See Maniscalco*, 793 F. Supp. 2d at 705 (quoting Restatement (Second) Conflict of Laws § 148(1)).

Thus, that state is presumed to have the most significant relationship unless the § 6 factors weigh in

favor of some other state.   *See id.*   These § 6 factors are:

> (a)  the needs of the interstate and international systems,
>
> (b)  the relevant policies of the forum,
>
> (c)  the relevant policies of other interested states and the relative
> interests of those states in the determination of the particular issue,
>
> (d)  the protection of justified expectations,
>
> (e)  the basic policies underlying the particular field of law,
>
> (f)  certainty, predictability and uniformity of result, and
>
> (g)  ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6.

Section 148(2) applies when the alleged misrepresentations and plaintiff's reliance occur in

different states.   *Maniscalco*, 793 F. Supp. 2d at 705.   This provision states that:

12

When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicile, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*See id.* (quoting Restatement (Second) of Conflict of Laws § 148(2)).  The Court must first weigh these factors to "determine which state has the greatest ties to the plaintiffs' . . . claim[s]." *In re Mercedez Benz*, 257 F.R.D. at 65.  Then, these "claim-specific considerations . . . "must be balanced against those enumerated in [§] 6." *Id.* (citing *Camp Jaycee*, 962 A.2d at 463).

The Court finds that Section 148(2) is applicable to this case.  It is clear that the bulk of the misrepresentations were made in South Carolina, which is where Plaintiff received information about the lots, attended sales meetings, and ultimately executed the contracts for sale.  It is true that Plaintiff attended the initial sales pitch in New Jersey.  However, he does not allege any misrepresentations stemming from that meeting other than the estimated infrastructure completion dates set forth in the first federal property report.  Plaintiff, however, received a second, revised

13

property report in South Carolina prior to purchasing the lots in this state. Thus, any purported misrepresentations from the first report were revised or modified prior to Plaintiff's purported reliance and purchase.

Plaintiff's reliance, on the other hand, arguably occurred in both South Carolina and New Jersey. Defendant correctly notes that Plaintiff flew to South Carolina and met with its representatives, received the second federal property report—which gave a new infrastructure completion date of April 2005—which he claims he relied on, and ultimately agreed to purchase the lots in this state. Moreover, he signed the purchase contracts here and the closings were conducted in Myrtle Beach by a South Carolina law firm. However, Plaintiff executed various closing documents back home in New Jersey. Furthermore, Plaintiff testified that he communicated with Defendant from his home in New Jersey and was told that everything was fine with the infrastructure construction, and asserts that he relied on these misrepresentations. He also received newsletters in New Jersey which described the development's progress, and detailed estimated completion dates, which he also relied on in New Jersey. Therefore, because some of Plaintiff's reliance purportedly occurred in New Jersey, Section 148(2) will apply.

Examining the factors set forth in Section 148(2), the Court finds that South Carolina law should apply. The first few factors slightly favor application of South Carolina law. In terms of the place of reliance, Plaintiff's initial and most significant reliance occurred in South Carolina, as this is where he agreed to purchase the lots and executed the contracts. However, Plaintiff asserts that Defendant continued to make misrepresentations to him about the status of the development, which he relied upon in New Jersey. Therefore, some reliance also occurred in that state. The Court finds that ultimately this factor tends to favor applying South Carolina law. The genesis of this entire

14

dispute was Plaintiff's purported reliance on Defendant's representations in this state, where he received the second report indicating infrastructure completion in April 2005, in purchasing lots in this state.

As to the next factor, the Court finds that Plaintiff received the bulk of the representations in South Carolina. However, it is true that Plaintiff also received certain representations in New Jersey about the status of the development. Thus, this factor tends to only slightly favor Defendant. The subsequent factor, where the representations were made, strongly favors Defendant as all of its activities occurred in this state. Concerning domicile, Plaintiff is a New Jersey resident, while Defendant is a South Carolina corporation. The Restatement indicates that if a party is an individual, their state of citizenship should be given more credence. Restatement (Second) of Conflict of Laws § 148, cmt. *i*. Thus, this factor slightly weighs in favor of Plaintiff. The place where the subject property is located is South Carolina. Therefore, this factor weighs heavily in favor of applying South Carolina law. Finally, Plaintiff rendered his performance (purchasing the lots) in South Carolina based on the purported false representations. Accordingly, this factor also favors application of South Carolina law.

The Court finds that on balance, the Section 148(2) factors weigh in favor of finding that South Carolina has greater ties to Plaintiff's claims. Taken together, the factors discussed above tip in favor of applying South Carolina law. Therefore, the next step is to weigh the § 6 factors to see whether any other state has a more significant relationship. The New Jersey Supreme Court has condensed the factors of Restatement § 6 "into four broader categories: (1) the competing interests of commerce among several states, (2) the national interests of commerce among several states, (3) the interest of the parties in realizing justified expectations and achieving predictable results, and (4) the

interests of judicial administration." *Ghaffari v. Hern*, No. 06-931, 2009 WL 2147092, at *5 (D.N.J. July 15, 2009) (citing *Pfizer, Inc. v. Employers Ins.*, 712 A.2d 634, 639 (N.J. 1998)). These factors do not require application of New Jersey law.[6]

"To gauge the competing interests of the relevant states" courts "consider whether the application of a competing state's law under the circumstances of the case will advance the policies that the law was intended to promote." *Ghaffari*, 2009 WL 2147092, at *6 (citations omitted). The purpose behind the statute of limitations in both South Carolina and New Jersey "is to prevent the litigation of stale or delayed claims and to prevent injustice by affording a defendant a fair opportunity to defend." *Id.* at *6; *see also Transp. Ins. Co. v. S.C. Second Injury Fund*, 699 S.E.2d 687, 690 (S.C. 2010). However, South Carolina's shorter statute of limitations indicates that it places a greater value on promoting "repose by giving security and stability to human affairs," *see Transp. Ins.*, 699 S.E.2d at 690, than New Jersey does. The Court finds that the application of New Jersey law to a South Carolina defendant (and potentially numerous other defendants located in South Carolina) would frustrate the policies of South Carolina.

The second factor under § 6 of the Restatement, the national interests of commerce among several states, requires the Court to analyze whether application of a competing state's laws to a state that has a dominant and significant relationship to the dispute would hinder inter-state commerce. *Ghaffari*, 2009 WL 2147092, at *6 (citations omitted). Here, and as noted above, South Carolina constitutes the state with the most significant relationship to the dispute. Exposing South Carolina

---

[6] While not undertaking the precise analysis at hand, it is noteworthy that United States District Judge Joel A. Pisano concluded that the relevant interests weigh in favor of transferring this case to the District of South Carolina, as "nearly all of the potential witnesses and evidence are located in South Carolina, and the vast majority of the alleged events and conduct that form the basis of Plaintiff's claims occurred there." *See* Opinion, ECF No. 17 at 8.

parties to liability for a longer period of time by applying the New Jersey statute of limitations would discourage individuals in South Carolina from entering into real estate transactions with New Jersey residents involving South Carolina real property.   Thus, this factor weighs in favor of the application of South Carolina law.

The third factor calls on the Court to determine the reasonable expectations of the parties as to which state's law would apply.   The record indicates that Plaintiff made multiple visits to South Carolina to review the property and obtain information, received more of the representations in South Carolina, executed the purchase contracts in South Carolina, and hired a South Carolina contractor to build his homes.   As such, the Court finds that the parties should have reasonably expected South Carolina law to apply, particularly in light of the fact that this dispute concerns real property located in this state.

"The fourth factor, the interests of judicial administration, requires a court to consider whether the fair, just and timely disposition of controversies within the available resources of courts will be fostered by the competing law chosen."   *Ghaffari*, 2009 WL 2147092, at *7 (citations omitted). The District of New Jersey already found that South Carolina is the proper venue for the present action, *see* ECF No. 17, and the Court finds that application of South Carolina law works best to manage the adjudication of the controversy before the court.   Accordingly, this factor also weighs in favor of the application of South Carolina law.

Therefore, the Court finds that the factors in § 6 of the Restatement also support application of South Carolina law to Plaintiff's consumer fraud, negligent misrepresentation, and fraud claims.

**B. Unjust Enrichment Cause of Action — Section 221 of the Restatement Also Mandates Applying South Carolina Law.**

Under the "most significant relationship test," Restatement § 221 governs the choice of law analysis for unjust enrichment claims.    Section 221 provides:

> (1) In actions for restitution, the rights and liabilities of the parties with respect to the particular issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the  principles stated in § 6.

> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

> > (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,

> > (b) the place where the benefit or enrichment was received,

> > (c) the place where the act conferring the benefit or enrichment was done,

> > (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

> > (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*See In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. at 60 (quoting Restatement (Second) of Conflict of Laws § 221).

The Section 221 factors support the application of South Carolina law to Plaintiff's unjust enrichment claim, as well.    The relationship between Plaintiff and Defendant was centered in South Carolina, as the property that is at the center of the dispute is located in South Carolina, the "Offers to

18

Purchase and Contracts" were executed in South Carolina, and the respective closings were in South Carolina. The second and third factor, the "place where the benefit or enrichment was received" and the "place where the act conferring the benefit or enrichment was done" favor South Carolina as well since at closing, Defendant received its payment. The fourth factor, weighs slightly in favor of Plaintiff, as explained above. However, the fifth factor, "the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment," weighs heavily in favor of South Carolina as the lots and other aspects of the development at issue are located there.

In sum, four of the five factors enumerated in Section 221 support the application of South Carolina law. "The Court's inquiry under the 'most significant relationship test' does not end, however, with the claim-specific factors contained in section 221. Rather, those factors must be weighed against the ones contained in Restatement §6." *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 62 (D.N.J. 2009). As discussed above, the principles outlined in § 6 of the Restatement do not override the presumption that South Carolina law should apply. Therefore, the Court also finds the application of South Carolina law to Plaintiff's unjust enrichment claim to be mandated under Section 221.

## II.    Timeliness of Plaintiff's Claims

As previously noted, under South Carolina law a three year statute of limitations will apply to each of Plaintiff's claims. For Plaintiff's claims, the discovery rule will apply to establish when the causes of action accrued. *See* S.C. Code Ann. § 15–3–530(7) (providing a three-year limitation on actions "for relief on the ground of fraud . . ., the cause of action in the case not considered to have accrued until the discovery by the aggrieved party of the facts constituting the fraud"); S.C. Code

19

Ann. § 15–3–535 (providing that "all actions initiated under Section 15–3–530(5) must be commenced within three years after the person knew or by the exercise of reasonable diligence should have known that he had a cause of action"); *Wellin v. Wellin*, No. 2:13–cv–1831–DCN, 2014 WL 234216, at *3 (D.S.C. Jan. 22, 2014) (noting that unjust enrichment is governed by a three year statute of limitations and that this "statute[] of limitations [is] modified by a doctrine known as the 'discovery rule'"). When the evidence of whether a person knew or should have known of a claim is conflicting, the question becomes an issue for the jury. *Maher v. Tietex.Corp.*, 500 S.E.2d 204, 207 (S.C. Ct. App. 1998).

"Under section 15–3–535, the statute of limitations is triggered not merely by knowledge of an injury but by knowledge of diligently acquired facts sufficient to put an injured person on notice of the existence of a cause of action against another." *Kelley v. Logan, Jolley, & Smith, LLP*, 682 S.E.2d 1, 4 (S.C. Ct. App. 2009) (citing *Epstein v. Brown*, 610 S.E.2d 816, 818 (S.C. 2005)). "The standard as to when the limitations period begins to run is objective rather than subjective." *Id.* (citing *Burgess v. Am. Cancer Soc'y, S.C. Div., Inc.*, 386 S.E.2d 798, 799 (S.C. 1989)). "Furthermore, '[t]he statute is not delayed until the injured party seeks advice of counsel or develops a full-blown theory of recovery; instead, reasonable diligence requires a plaintiff to act with some promptness.'" *Id.* at 4–5 (quoting *Maher v. Tietex Corp.*, 500 S.E.2d 204, 207 (S.C. Ct. App. 1998)) (internal quotation marks omitted). Finally, "[d]eliberate acts of deception by a defendant calculated to conceal from a potential plaintiff that he has a cause of action toll the statute of limitations." *Doe v. Bishop of Charleston*, 754 S.E.2d 494, 500 (S.C. 2014) (citing *Strong v. Univ. of S.C. Sch. of Med.*, 447 S.E.2d 850, 852 (S.C. 1994)).

For fraud claims, statute of limitations will not "begin to run until discovery of the fraud itself or of 'such facts as would have led to the knowledge thereof, if pursued with reasonable diligence.'" *See Burgess*, 386 S.E.2d at 799 (quoting *Grayson v. Fidelity Life Ins. Co. of Philadelphia*, 103 S.E. 477 (S.C. 1907)). "A party cannot escape the application of this rule by claiming ignorance of existing facts and circumstances, because the law also provides that if such facts and circumstances could have been known to the party through the exercise of ordinary care and reasonable diligence, the same result follows." *Id.* (citing *Tucker v. Weathersbee*, 82 S.E. 638, 640 (S.C. 1914)). "Thus, either actual or constructive knowledge of facts or circumstances, indicative of fraud, trigger a duty on the part of the aggrieved party to exercise reasonable diligence in investigating and, ultimately, in pursuing a claim arising therefrom." *Id.* at 800. The discovery rule focuses "upon whether the complaining party acquired knowledge of any existing facts 'sufficient to put said party on inquiry, which, if developed, will disclose the alleged fraud.'" *Id.* at 799 (quoting *Walter J. Klein Co. v. Kneece*, 123 S.E.2d 870 (S.C. 1962)).

In this case, the Plaintiff alleges that he relied on Defendant's representations that the water and sewer infrastructure were nearing completion—April 2005 according to the second report—at the time he purchased the lots.   He also argues that Defendant continued to lead him on and misrepresent that construction was nearing completion for several years after he purchased the lots, upon which he also relied.   Plaintiff argues that Defendant concealed the truth about problems with the development in its responses to the Plaintiff's repeated inquiries.   Plaintiff asserts that he conducted a reasonable investigation, but Defendant concealed the true reasons for the delay.   Plaintiff argues that he was unaware that Defendant was concealing the true reasons for the delay.

21

The Court reiterates that the action was filed on February 4, 2011.  Three years prior to this date would be February 4, 2008.  Therefore, as long as Plaintiff did not discover, or should not have reasonably discovered, the existence of a claim prior to this date, his claims would be timely. Plaintiff stated in his deposition he began to suspect in the latter part of 2008 that some of the things he had been told by Defendant about the infrastructure construction were not true, and he began his investigation at this point.  He further testified in his deposition that he did not believe "beyond a doubt that the developer had misrepresented their claims" until he received the May 6, 2009 email from the Grand Strand Water and Sewer Authority.  This email provided documentation which showed a December 2007 permitting approval and project completion date.  Plaintiff claims that receipt of this email was the first indication that delays were due to a permitting issue caused by Defendant's improper construction of the water and sewer infrastructure.  Plaintiff testified that receipt of this email informed him that Defendant was aware of significant problems with the sewer system in December 2006, which Defendant never disclosed to him despite his inquiries.

The Court finds that there is a genuine issue of material fact as to when a reasonable person would have known that the claims asserted by Plaintiff existed against the Defendant.  Consequently, an issue of fact exists as to whether South Carolina's statute of limitation bars these claims. Defendant correctly notes that Plaintiff was aware that the infrastructure construction was delayed back in 2005.  Defendant argues that this constitutes the "discovery" of the purported misrepresentations, meaning the statute of limitations began to run on Plaintiff's causes of action at this point.  Defendant, however, misconstrues Plaintiff's theory of the case.  Plaintiff's allegations do not simply assert that Defendant represented a completion date which did not come to fruition. Plaintiff specifically claims that Defendant engaged in an ongoing pattern of concealment and

misrepresentation, hiding the true reasons for the delays in the infrastructure construction.    Plaintiff was undoubtedly aware that the construction was not proceeding according to the schedule originally promised.    However, based on the evidence in the record, the Court finds that there is a genuine issue of material fact as to when Plaintiff knew or should have known of a potential claim.    Accordingly, the Court cannot say as a matter of law that Plaintiff knew or should have known that he had these claims against Defendant over three years prior to the filing of this suit.    Therefore, summary judgment is denied.

### CONCLUSION

The Court has thoroughly reviewed the entire record, including Defendant's Motion for Summary Judgment, Plaintiff's Response in Opposition to Defendant's Motion, Defendant's Reply to the responses, and the applicable law.    For the reasons stated above, the Court denies Defendant's motion.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

  s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, South Carolina
June 25, 2014

23